## McWilliams Dredging Co. *v.* McKeigney, Chairman, State Tax Commission

No. 40135 April 16, 1956 86 So. 2d 672

732

*Tighe & Tighe,* Jackson, for appellant.

733

*John E. Stone,* Jackson, for appellee.

738

LEE, J.

This is an appeal by McWilliams Dredging Company from a decree of the Chancery Court of the First Judicial District of Hinds County, which affirmed, as modified, an additional assessment by the State Tax Commission against it for income taxes for the years 1951 and 1953.

The Company is an Illinois corporation, but had its principal office in New Orleans, Louisiana. During the years in question, it was engaged in the performance of dredging contracts. In 1951, the projects designated as Gulf Coast Sand Beach No. 1, 2 and 3 were performed entirely within the State of Mississippi. In addition, it performed Trunk Line Crossing over the Mississippi River between Mississippi and Arkansas, and Mid-Valley Crossing and Mid-Valley Repairs over the Mississippi River between Mississippi and Louisiana. It had a number of other projects in Illinois, Louisiana and Texas.

In 1953, the Company performed contracts on Pascagoula Road Fill, Jones Cutoff and Biloxi Beach, entirely within the State of Mississippi, and Trunk Line Repairs

over the Mississippi River between Mississippi and Arkansas, and Mayersville Crossing over the Mississippi River between Mississippi and Louisiana. In addition, it had a number of other contracts in Illinois, Louisiana, Texas and North Carolina.

The Company filed its 1951 income tax return within the time provided by law, using a so-called apportionment formula. Thereafter on November 17, 1952, J. A. Hatcher, an auditor in the Income Tax Division of the State Tax Commission, advised the Company that the use of such a formula was discouraged by the Commission; that a direct accounting is better, at least gross sales to gross sales, and inquiring if such basis was possible. On January 22, 1953, H. N. Eason, the Chief of the Division, by letter, called for a response to the previous letter of November 17th. On February 6, 1953, the Company, through its treasurer J. A. Kincaid, amended its return so as to show the ratio of gross receipts in Mississippi to its total gross receipts, Mississippi's percentage thereof being 20.881, and made an additional payment of $2,148.26. Several conferences occurred thereafter. In the meantime the 1953 return had been filed.

On June 21, 1954, W. L. Perdue of the special audit division of the Commission, following a recent conference, wrote the Company and enclosed a copy of the field auditor's examination. This copy went into great detail both as to the 1951 and the 1953 returns. It set up under schedules 1 and 2 the receipts from the contracts in Mississippi for both years, together with a cost detail in each instance and additional overhead costs, prorated on the basis of direct contract costs, and thus arrived at the net profits from the operations which were subject to income taxes. The Company was advised therein that its income for 1951 in the State should have been reported at $735,697.91 and for 1953 at $99,603.00; that it owed a balance of $44,345.63 for

1951 and $5,534.70 for 1953, including damages and interest; and that the Commission proposed the assessment of an additional tax in those amounts, subject to final determination.

On July 2, 1954, J. A. Kincaid, for the Company, acknowledged receipt of the field auditor's examination, advised that exceptions would be taken, and that, after the writer's return in July, he would contact the Commission for the purpose of a hearing.

A letter by W. L. Perdue to the Company on August 10, 1954, referred to a conference of the day before, and agreed to allow the additional overhead expenses, as claimed. A detailed statement of the basis therefor was enclosed, and it asked that check should be remitted in the sum of $38,763.09. The letter also called for payment of $1,103.68 for 1951 and 1953 franchise taxes.

On August 20, 1954, Kincaid, by letter to H. N. Eason, enclosed the franchise tax as demanded but was indefinite as to his understanding of the basis for the additional amount of income tax.

A letter of H. N. Eason, of date of August 24, 1954, in response to Kincaid's letter of the 20th, advised that his understanding was that information would be submitted to support the company's claim that it belonged in a separate category from other taxpayers; and that the matter was not disposed of as long as the Company wished to keep it open.

Again, on September 1, 1954, Eason wrote Kincaid, advising that Perdue had accepted the Company's figures in arriving at the additional income tax of $38,763.09.

On September 17, 1954, Kincaid acknowledged receipt of Eason's letters of August 24th and September 1st and indicated his belief that the facts regarding the Company's operations in Mississippi made the state regulations for separate accounting inapplicable, and that it would probably request additional hearings.

On September 22, 1954, Eason acknowledged receipt of the above letter and advised that a hearing would be extended at any time. In justification of the Commission's demand for a separate accounting as to the contracts performed in Mississippi, he said: "It is believed we can prove that you, of necessity, must determine the probable cost of any contract performed at any time in order to bid. Having done so, it would be the height of folly not to maintain an accounting system which would tell you whether or not you had erred in arriving at your bid. Only by such an experience can you bid intelligently, and every contractor has and will be required to report on such a basis."

On January 10, 1955, Eason by letter to the attorneys for the Company, enclosed a detailed amended statement, showing an aggregate liability for 1951 and 1953 income taxes, including interest to January 15, 1955, of $41,134.23.

On March 3, 1955, the Company's attorneys asked for a hearing at 9:30 A.M. Thursday March 10th on the Company's income tax matter; and on March 4th thereafter Eason, by letter, advised the attorneys that such hearing would be held as requested.

On the date fixed, the Commission heard the objections to the assessment. The cause was taken under advisement and on April 21, 1955, the Commission entered an order which recited that the cause was heard on March 10, 1955, and was taken under consideration for decision at a later date, and that the Commission "being fully advised in the premises and of the opinion that the said assessment is proper and should be upheld, does hereby sustain and approve the assessment in the following figures and particulars to-wit: Year 1951—additional tax $26,366.83, with interest from March 15, 1952, to date of payment. Year 1953—additional tax $9,795.28, with interest from March 15, 1954 to date of payment."

The appellant maintained in the trial court, and contends here, that the additional assessment for 1951 was not "determined and assessed within three years from the date such was filed", and was therefore barred because under Section 9247 (2), Code of 1942 Anno., "no suit or other proceedings for the collection of any taxes due under the income revenue laws of the state shall be begun after the expiration of three (3) years from the date such return was filed". The section also has a further provision in these words: "* * * Provided, further, that in the case of a false or fraudulent return with intent to evade a tax or a failure to file a required return, the amount of tax due may be termined, assessed and collected, and a suit or proceedings for the collection of such amount may be begun at any time after it becomes due."

The income tax law contemplated that there would be cases where returns would be filed, and on their face, it would appear that no tax was due, or the proper amount was being paid; but that, on an examination by the Commissioner, or his agents, it would be discovered that some tax was due in the first instance, and that more was due than had been paid, in the second instance. Therefore Section 9247 (3) thereof provides: "If upon examination of a return made under this act or income laws heretofore, a tax or a deficiency in tax is discovered, the taxpayer shall be notified thereof and given a period of not more than sixty (60) days after such notice is sent by mail in which to file an appeal and show cause or reason why the tax or deficiency should not be paid. Opportunity for a hearing before the commissioner shall be granted and a final decision thereon shall be made as quickly as practicable, and any tax or deficiency in tax found due after such hearing shall be assessed and paid together with the damages and interest, if applicable thereto, within ten (10) days after notice and demand by the commissioner."

When the auditors checked the 1951 return, they discovered a deficiency in the tax paid—that the Company had not paid enough tax. Consequently when on June 21, 1954, Perdue wrote the Company and enclosed a copy of the detailed receipts and expenses of the Mississippi contracts, he was proceeding under Section 24, Chapter 120, Laws 1934, and Section 9247 (3), supra, to assess the taxpayer with an additional liability of $44,345.63. This was subsequently reduced to $38,763.09. These figures covered both 1951 and 1953, but of course the statute of limitation had no application whatever to the assessment for 1953. It appeared that negotiations had reached an impasse by January 10, 1955, when Eason affirmed the proposition that $41,134.23, including interest to January 15, 1955, was the amount due.

▆▆ The acts of Perdue, Eason and other representatives, were the acts of the chairman of the Commission, in whom was vested the administration of the income tax laws. The additional assessment by them was an assessment by the chairman. Rigby v. State, 194 Miss. 775, 11 So. 2d 823. ▆▆ If, after notice, there had been no request for a hearing, the assessments would have been final. However, in an effort to set aside and defeat these assessments, the appellant asked for and obtained a hearing before the full Commission. Its objections were overruled. In so doing, the Commission sustained and approved the assessment as theretofore initially made, modified and approved, which had occurred less than three years from the date of the filing of the return. Consequently the statute of limitation had no application.

The additional assessment having been made before the lapse of three years from the date of the return for 1951 income tax, it is not necessary to determine whether or not the chancellor erred in holding, in effect, that the facts in connection with appellant's returns disclosed them to be false or fraudulent within the meaning of

Section 9247 (2), supra. For the same reason it is not necessary to consider whether the three year statute was in violation of Sections 100 and 104, Constitution of 1890. These reasons were not stated in the decree as bases therefor. Nor has it been necessary to apply the provisions of Section 25 (2), Chapter 402, Laws of 1952, relative to notice from the commissioner as sufficient to arrest the running of the statute of limitations.

The appellant also contends that its business was a unitary operation, that is, the component parts were so closely connected and necessary to each other that the business could not be divided up into separate units for state income tax purposes.

Section 9222 (1), Code of 1942 Anno., provides for the levy and collection of an income tax on resident corporations, etc.; and (2) thereof says: "A like tax is hereby imposed to be assessed, collected and paid annually at the rate specified in this section and as hereinafter provided upon and with respect to the entire net income, from all property owned and from every business, trade or occupation, carried on in this state by individuals, corporations, partnerships, trusts or estates, not residents of the state of Mississippi."

Under Regulation 9, Article 247, adopted by the Commission in 1949, pursuant to the statutes, foreign corporations were placed in three classes. Class (1) is not involved here. The description of classes (2) and (3) is as follows: "(2) Those Foreign Corporations or Non-Residents which (who) are created under the laws of another State or foreign Government and conduct a business or own property within the State of Mississippi and also the same or related business or property without the State of Mississippi but which (who) maintain a system of accounts which will clearly and accurately reflect the net income earned within the State of Mississippi: (3) Those Foreign Corporations or non-Residents which (who) are created under the laws of an-

other State or Foreign Government and maintain a place of business or own property within this State and also without this State but whose system of accounts will not clearly and accurately reflect the true net income within the State of Mississippi.''

Taxpayers in Class (3) therein were further classified as Manufacturing, Trading, and Personal Service and Special Cases. It was further provided that,

''Those taxpayers classified under Class (3) above will be required to state in detail why it is necessary to resort to the use of a formula. The Commissioner will accept or reject any return filed on that basis.

''Taxpayers will be placed in Class 3 above only when it is not possible to include them in Classes 1 or 2. The commissioner takes the position that employment of an apportionment formula is, regardless of the refinements or variables used, merely an approximation of the net income realized from operations conducted within and without the geographical limits of the State of Mississippi. For that reason, the use of an apportionment formula will be discouraged and only in those cases where it is not possible to determine Mississippi net taxable income by the records or accounts of the taxpayer, will such formula be accepted as the basis of measuring the Mississippi income tax liability.

''The Commissioner may, at his discretion, add or change such additional elements or factors as may be determined necessary in arriving at a formula, as set out in this article, and may revise any formula as set out in these Regulations, as will, in the opinion of the Commissioner, properly reflect the income of such taxpayer.''

The controversy arose in this way: In its returns the appellant assumed to use the manufacturer's formula, taking the position that the dredge was a floating factory. Originally the appellant made no report whatever of its income from the crossings of the Mississippi River.

Its excuse was that it was unable to tell what part of the work was done in Mississippi, Arkansas or Louisiana. Finally, however, it was willing to amend its returns to show a division of this income on a 50% basis between Mississippi and Arkansas and Mississippi and Louisiana. That basis was satisfactory both to the Commission and the taxpayer. In fact there was an agreement to that effect prior to the trial in the court below. Kincaid, in his testimony, admitted that this was a fair distribution.

Out of the 19 projects for 1951, the Company showed gross profits in 18 of them. This was verified by an exhibit to the testimony of Kincaid. Of the 6 contracts wholly or partly performed in Mississippi, substantial gross profits were shown. The net profits in Mississippi were $409,788.43, and net losses on operations outside the state, by reason of the Chain of Rock Illinois project in the sum of $592,518.00, amounted to $135,499.83.

In 1953, according to an exhibit to the testimony of Kincaid, the net profits from the 5 operations wholly or partly in Mississippi amounted to $152,434.00, while showing a loss of $920,145.00 by reason of two small losses in Louisiana and a large one of $1,313,549.00 in North Carolina.

 ██ .The purpose of the state income tax law, insofar as a foreign corporation is concerned, is to tax its income, which is earned in the state. There is no purpose to tax such income where it is earned outside of the state, as this is not permissible. Mississippi Cotton Seed Products Co. v. Stone, 184 Miss. 409, 184 So. 428; Lincoln Life Ins. Co. v. State Tax Commission, 196 Miss. 82, 16 So. 2d 369.

 ██ The right of a State to collect a tax on income earned in the taxing state, although the taxpayer is a citizen of a different state, was recognized in Shaffer v. Carter, 252 U. S. 37, 64 L. Ed. 445, 40 S. Ct. 22. That

case also settled the question: "That there is no unconstitutional discrimination against citizens of other states in confining the deduction of expenses, losses, etc., in the case of non-resident taxpayers, to such as are connected with income arising from sources within the taxing state, likewise is settled by that decision." Travis v. Yale & Towne Mfg. Co., 252 U. S. 60, 64 L. Ed. 460, 40 S. Ct. 228.

 Our law unquestionably favors the specific accounting by foreign corporations. · See Regulation 9, supra. It has been well said that "theories of allocation have no place in determining income tax on corporation, if net income within state can be distinguished from outside business." Magnolia Petroleum Co. v. Oklahoma Tax Commission, et al, 190 Okla. 172, 121 Pac. 2d 1008.

In Butler Bros. v. McColgan, 315 U. S. 501, 62 S. Ct. 704, 86 L. Ed. 991, relied on by the appellant, there was involved a franchise tax based on net income, in which the tax commissioner utilized a formula in accordance with California law. The appellant was engaged in the wholesale drygoods and general merchandise business, having distributing houses in several states, including one in San Francisco. It had a rather complicated system of accounting which showed a loss of $82,851.00 from its operation in the San Francisco house, whereas the operation of all of its houses showed a profit of $1,149,677.00. The tax commissioner under the formula allocated to California 8.1372 percent thereof. The appellant contested this assessment on the ground that, by this formula, a loss of $82,851.00 was converted into a profit of over $93,500.00 in California. The opinion held that the California statute provided a method of allocation which was fairly calculated to assign to California that "portion of the net income 'reasonably attributable' to the business done there;" and that the burden was on the appellant to show that the formula resulted in extraterritorial values being taxed.

■■ ■ In the case here the tax commission did not seek to have a formula upheld. It contended that specific accounting should and could be made. It rejected the company's formula. Consequently the burden was on the company to show that its extraterritorial values were being taxed or affected. It cannot complain unless it can show that the Commission's method was arbitrary and unreasonable. Bass, Ratcliff & Gretton, Ltd. v. State Tax Commission, 266 U. S. 271, 69 L. Ed. 282, 45 S. Ct. 82.

As has been stated, the formula, upon which the Company based its returns, was applicable to manufacturing. But by no stretch of the imagination could dredging fall into the category of manufacturing.

■■ ■ The Company maintained that its operations were so unitary that it was impossible, from its books, to account specifically on its Mississippi contracts. Yet, by its books, it had no difficulty in so accounting to the State of Louisiana for its income in that state.

In bidding on a contract, it was of course necessary for the Company to anticipate and take into consideration all proper expenses and costs in advance in making its bid so that it could insure a profit. If this could be fairly done with reasonable certainty, assuredly the Company could keep up with its receipts and expenses, and reasonably determine, and have reflected in its books, the profit or loss on each particular contract. The auditors of the tax Commission experienced no insurmountable difficulty in ascertaining from the books of the Company its receipts from each project together with expenses properly chargeable thereto.

One serious trouble about the manner in which the Company kept its books was that, although a substantial profit was shown on all of the contracts wholly or partly performed in Mississippi, yet, by insisting that it had the right to charge to the Mississippi projects an unreasonable amount of the so-called "idle shop account", it

attempted to cancel out a large part of its Mississippi income. Since it had a number of other projects, the Company was not entitled to attribute to its Mississippi contracts an undue proportion of this account.

■■■ The fact that such an over-all return on the Company's business, so far as federal income is concerned, might be proper or acceptable for that purpose is no reason why it should be applicable insofar as state income is concerned. If the laws or conditions in this state were perhaps more conducive to the earning of profits than elsewhere, nevertheless this should not have the effect of penalizing this State by taking the income earned here to replenish the Company's coffers, which had been exhausted by loss from profligate or improvident contracts elsewhere.

The final decree determined the taxable income for both 1951 and 1953, computed the taxes which were due thereon, credited the amounts previously paid, modified the order of the Commission so as to conform thereto, and gave final judgment for $32,916.98, plus interest to accrue.

From what has been said, it follows that the decree of the trial court should be and is affirmed.

Affirmed.

*McGehee, C.J.,* and *Roberds, Holmes* and *Ethridge, JJ.,* concur.